UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MORGAN M.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:22-cv-01834-KMB-RLY |
| | ) |
| KILOLO KIJAKAZI, | ) |
| | ) |
| Defendant. | ) |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff Morgan M. applied for disability insurance benefits from the Social Security Administration ("SSA") on February 19, 2020, alleging an onset date of August 31, 2019. [Dkt. 10-2 at 11.] Her application was initially denied on September 8, 2020, [dkt. 10-3 at 11-12], and upon reconsideration on December 7, 2020, [*id.* at 27]. Administrative Law Judge ("ALJ") Mary Ann Poulose conducted a hearing on March 21, 2022. [*Id.* at 41.] The ALJ issued a decision on May 2, 2022, concluding that Morgan was not entitled to receive disability insurance benefits. [*Id.* at 20.] The Appeals Council denied review on July 11, 2022. [*Id.* at 2.] On September 16, 2022, Morgan timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g). [Dkt. 1.]

**I. STANDARD OF REVIEW**

"The Social Security Administration (SSA) provides benefits to individuals who cannot obtain work because of a physical or mental disability." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1151

---

[1] To protect the privacy interests of claimants for Social Security benefits, and consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States Courts, the Southern District of Indiana has opted to use only the first names and last initials of non-governmental parties in its Social Security judicial review opinions.

(2019).  Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) (citing 42 U.S.C. § 423(d)(1)(A)).

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision.  *Stephens*, 888 F.3d at 327.  "[S]ubstantial evidence" is "evidence that 'a reasonable mind might accept as adequate to support a conclusion.'"  *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154).  "Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts, or reweighing the evidence to decide whether a claimant is in fact disabled."  *Stephens*, 888 F.3d at 327.  Reviewing courts also "do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'"  *Zoch*, 981 F.3d at 601 (quoting *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017)).  "[E]ven under deferential standard of review for social security disability cases, an [ALJ] must provide a logical bridge between the evidence and [the] conclusions."  *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (internal quotations omitted).

The SSA applies a five-step evaluation to determine whether the claimant is disabled. *Stephens*, 888 F.3d at 327 (citing 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).  The ALJ must evaluate the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citations omitted).  "If a claimant satisfies steps one, two, and three, she will automatically be found disabled.  If a claimant satisfies steps one and two, but not three, then she must satisfy step four.  Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy."  *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe."  *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009).  In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling."  *Id*.  The ALJ uses the RFC at Step Four to determine whether the claimant can perform his own past relevant work and if not, at Step Five to determine whether the claimant can perform other work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv), (v).

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits.  *Stephens*, 888 F.3d at 327.  When an ALJ's decision does not apply the correct legal standard, a remand for further proceedings is usually the appropriate remedy.  *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021).  Typically, a remand is also appropriate when the decision is not supported by substantial evidence.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

## II. RELEVANT BACKGROUND

Morgan was 27 years old on August 31, 2019, the alleged onset date. [Dkt. 10-4 at 4.] Morgan is a high school graduate, [dkt. 10-2 at 16], and she previously worked as a material handler, [*id.* at 19].[2]

The ALJ followed the five-step sequential evaluation set forth by the SSA in 20 C.F.R. § 404.1520(a)(4) and 20 C.F.R. § 416.920(a)(4) and concluded that Morgan was not disabled. [*Id.* at 13-20.] Specifically, the ALJ found as follows:

- At Step One, Morgan had not engaged in substantial gainful activity[3] since August 31, 2019, the alleged onset date. [*Id.* at 13.]

- At Step Two, Morgan had the following severe impairment: circadian rhythm disorder.[4] [*Id.* at 14.]

- At Step Three, Morgan did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [*Id.* at 15.]

- After Step Three but before Step Four, Morgan had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: no ladders, ropes, or scaffolds, or exposure to hazards such as unprotected heights, operation of heavy machinery, or commercial driving." [*Id.* at 16.]

---

[2] The relevant evidence of record is set forth in the Parties' briefs and need not be repeated here. Specific facts relevant to the undersigned's disposition of this case are discussed below.

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

[4] "Circadian rhythm disorders, also known as sleep-wake cycle disorders, are problems that occur when your body's internal clock, which tells you when it's time to sleep or wake, is out of sync with your environment." https://www.nhlbi.nih.gov/health/circadian-rhythm-disorders#:~:text=Circadian%20rhythm%20disorders%2C%20also%20known,cycles%20about%20every%2024%20hours.

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Morgan's RFC, the ALJ concluded that Morgan was able to perform her past relevant work as a material handler.[5]

### III. DISCUSSION

Morgan makes three assertions of error regarding the ALJ's decision: (1) that the ALJ failed to incorporate into the RFC mild mental limitations assessed by state agency psychological consultants, (2) that the ALJ failed to develop the record by relying exclusively on her lay evaluation of raw medical data to determine Morgan's functional limitations from her sleep disorder, and (3) that the ALJ failed to adequately evaluate Morgan's subjective complaints. Each of Morgan's arguments will be addressed in turn.

**A. The ALJ did not err by allegedly omitting mild mental limitations from the RFC.**

Morgan claims that the ALJ committed reversible error by failing to incorporate into the RFC or explain her rejection of mild mental limitations assessed by two state agency consultants whose opinions the ALJ found persuasive. [Dkt. 12 at 12.] According to Morgan, both state agency psychological consultants opined that she had mild limitations in interacting with others; concentrating, persisting, and maintaining pace; and adapting and managing herself. [*Id.*] Despite finding these opinions persuasive, Morgan asserts that the ALJ did not include any corresponding restrictions related to her mild mental limitations in the RFC and that the ALJ's decision is silent as to why mental limitations were omitted from the RFC. [*Id.* at 13.] Even if her mental limitations were only mild in nature, Morgan claims that remand is required here because the ALJ still needed to explain how these limitations factored into the RFC or alternatively explain why these limitations did not merit non-exertional limitations in the RFC. [*Id.* at 15.] Accordingly, Morgan

---

[5] Having determined that Morgan could perform her past relevant work, the ALJ did not proceed to Step Five and thus did not determine whether jobs existed in significant numbers in the national economy that Morgan could perform.

5

argues that the hypothetical posed to the VE was incomplete, and the VE's testimony does not amount to substantial evidence. [*Id.* at 17.]

In response, the Commissioner contends that the ALJ reasonably determined that Morgan did not require accommodations for her mild mental limitations. [Dkt. 14 at 8.] The Commissioner argues that Morgan incorrectly assumes her mild mental impairments automatically translate to work limitations. [*Id.* at 8-9.] According to the Commissioner, the ALJ reasonably relied on the opinions of the state agency psychologists that concluded that Morgan had mild impairments in the area of mental functioning but did not find any work-related limitations. [*Id.* at 10.] The Commissioner also contends that Morgan has not pointed to any objective record evidence contradicting the state agency psychologists' opinions and that Morgan relies only on her unsupported subjective allegations that she requires certain workplace limitations for her mild mental impairments. [*Id.*] Thus, the Commissioner argues that substantial evidence supports the ALJ's determination that Morgan's mental impairments were non-severe and did not affect her ability to work. [*Id.* at 14.]

In reply, Morgan reiterates her allegation that the ALJ committed reversible error by failing to include any mental limitations in the RFC or explain why mild limitations were omitted. [Dkt. 15 at 3.]

"Although the RFC assessment is a function-by-function assessment … the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 9327 F. App'x. 652, 657 (7th Cir. 2009) (internal quotations omitted). The individual claiming disability bears the burden of proof at steps one through four of the five-step sequential evaluation set forth by the SSA. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Gedatus v. Saul*, 994 F.3d 893, 898 (7th

6

Cir. 2021). "It [is the claimant's] burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work." *Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018).

Morgan cites *Mark M.* and several other non-binding cases from the Northern District of Illinois as support for her argument that an ALJ has an obligation "to explain either how the RFC incorporate[d] restrictions caused by Claimant's mild mental limitations, or, alternatively, why the ALJ believed that the mild mental limitations did not merit a non-exertional limitation in the RFC." *Mark M. v. Kijakazi*, 2022 WL 17960687, at *5 (N.D. Ill. Dec. 27, 2022). However, the Commissioner cites several decisions from this District that the Court finds persuasive on the issue here. For instance, *Palomo v. Colvin* held that a finding of mild limitations at Step Two "did not obligate the ALJ to include mental limitations in the RFC" and that "a mild limitation will not ordinarily be preclusive of one's ability to work." 2015 WL 926208, at *13-14 (S.D. Ind. Mar. 3, 2015) (citing *Baker v. Astrue*, 2011 WL 3585613, at * 6 (S.D. Ind. Aug. 15, 2011)). Similarly, in *McClure v. Colvin*, the claimant argued that the ALJ should have incorporated mild mental limitations into the RFC. 2013 WL 4509848, at *7 (S.D. Ind. Aug. 23, 2013). But the court disagreed, finding that "a mild limitation in concentration, persistence, and pace actually indicates that there was no more than minimal limitation, and therefore it is not relevant to the RFC assessment." *Id.*

The Court finds *Palomo* and *McClure* persuasive here because they are consistent with the fact that it is *the claimant's burden* to establish not just the existence of limitations but to provide evidence that they support specific work-related limitations as well. *See Weaver*, 746 F. App'x at 579. Morgan has not cited any objective record evidence or medical opinion evidence indicating that she requires specific workplace limitations because of her mild mental limitations. Although

7

state agency psychological consultants Drs. Horton and Neville assessed Morgan with mild mental limitations, they did not include any work-related limitations in their opinions or indicate in any other way that Morgan would require specific workplace restrictions. [*See* dkt. 10-3 at 7-12, 21-24.] The ALJ also relied on the opinion of consultative psychological examiner Dr. Kadlec, who similarly did not recommend any work-related mental restrictions. [Dkt. 10-7 at 299-303.] In fact, the ALJ's finding of mild mental impairments indicates no more than minimal limitations, which is especially true given that the ALJ found Morgan could perform *unskilled* work. *See Palomo*, 2015 WL 926208, at *14 (acknowledging that "a mild limitation in concentration could conceivably affect [a claimant's] ability to maintain highly skilled employment," but the same is not true for only skilled work) (internal quotation marks omitted); *see also* 20 C.F.R. 404, Subpt. P, App'x 1 § 1200(F)(2) (explaining that a mild limitation means that "[y]our functioning … on a sustained basis is *slightly limited*") (emphasis added).

Although the ALJ acknowledged Morgan's mild mental limitations, she also expressly found that such limitations were non-severe and caused only "a minimal limitation in [Morgan's] ability to do basic work activities." [Dkt. 10-2 at 15.] The Court does not find Morgan's argument to present reversible error; rather, it seems to be an invitation for this Court to reweigh the evidence, which it cannot do. *See Chad R. v. Saul*, 2020 WL 4344926, at *7 (S.D. Ind. Jul. 29, 2020) ("Plaintiff's claim that the RFC should have accounted for mild limitation in adapting and managing himself represents to some extent an invitation for this Court to reweigh the evidence, which it cannot do."). Morgan does not point to any objective record evidence indicating that she requires additional limitations; instead, she merely speculates and points to her own subjective testimony that her mild limitations would require her to be absent from work or be off task. This is insufficient to show reversible error. *See Dudley v. Berryhill*, 773 F.App'x 838, 843 (7th Cir.

2019) ("When no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error."). The Court concludes that Morgan has not met her burden to show reversible error in the ALJ's decision on the points she raises in this section.[6]

### B. The ALJ did not evaluate raw medical data or otherwise fail to develop the record.

Morgan argues that the ALJ committed reversible error because she allegedly formulated the physical RFC limitations without any expert medical opinion and instead relied on her subjective interpretation of raw medical data. [Dkt. 12 at 18.] Specifically, Morgan claims that the ALJ relied exclusively on her lay knowledge to interpret the polysomnogram and sleep latency study results to formulate the RFC, which the ALJ did not have sufficient medical expertise to do. [*Id.* at 18-19.] In Morgan's view, the ALJ should have ordered a consultative examination or requested medical expert testimony at the hearing to interpret the sleep study test and assess Morgan's functional limitations from Circadian Rhythm Disorder. [*Id.* at 21.]

In response, the Commissioner argues that Morgan mischaracterizes the record when claiming that the ALJ "interpreted" raw medical data. [Dkt. 14 at 14.] Morgan ignores that the ALJ's finding that the study overall demonstrated no evidence of hypersomnia was not the ALJ's interpretation. [*Id.*] Rather, the Commissioner asserts that the ALJ merely accepted the interpretation of the sleep specialist who conducted the study, Dr. Levine. [*Id.*] According to the Commissioner, Dr. Levine interpreted the data and determined that, despite quickly falling asleep during the first two naps of the study, the results "show[ed] no evidence of hypersomnia." [*Id.* (quoting dkt. 10-7 at 355).] Thus, the Commissioner claims that it was appropriate for the ALJ to

---

[6] Morgan's claim that the hypothetical posed to the VE did not adequately reflect all of her limitations and restrictions is premised on the same claim that the ALJ did not adequately account for her mild mental limitations. Accordingly, Morgan's arguments about the hypothetical posed to the VE fail for the same reasons.

9

rely on the interpretation of a medical test performed by Morgan's own treatment provider. [*Id.* at 14-15.] Further, the Commissioner asserts that Dr. Levine's findings were reviewed by another sleep specialist, Dr. Asis, and the ALJ adopted Dr. Asis's limitations for Morgan with respect to driving, heavy machinery, and hazards. [*Id.* at 15.]

In reply, Morgan maintains that, without an expert medical opinion, the ALJ was left to decide on her own how to interpret the sleep study result. [Dkt. 15 at 5.] And she reiterates her argument that the ALJ subjectively concluded that because only the first two naps were positive for hypersomnia, Morgan's allegation of disabling excessive sleepiness was inconsistent with the record. [*Id.*] This conclusion, according to Morgan, constitutes an impermissible lay opinion that the ALJ was not qualified to assess. [*Id.* at 6.] In addition, Morgan claims that the ALJ did not explain why she decided to accept one portion of the sleep study that showed no hypersomnia while rejecting the other portion of the sleep study that showed evidence of hypersomnia. [*Id.*]

The Seventh Circuit Court of Appeals has repeatedly held that an ALJ may not "play doctor" and "interpret 'new and potentially decisive medical evidence' without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)). It is not error, however, for an ALJ to merely restate a physician's findings regarding the interpretation of a claimant's exams or procedures. *Durham v. Kijakazi*, 53 F.4th 1089, 1095 (7th Cir. 2022) (It was not error when "the ALJ did not attempt to interpret, on his own, the significance of any . . . medical tests or procedures," but rather "relied, as he should, on the conclusions of [the claimant's] treating physicians.")

Here, there is nothing indicating that the ALJ interpreted raw medical data. Instead, the ALJ's decision makes clear that the ALJ merely adopted sleep specialist Dr. Levine's findings from

Morgan's February 2017 Multiple Sleep Latency Study.[7] After conducting five separate tests, Dr. Levine concluded that Morgan had a "mean sleep latency of 11.5 minutes (normal > 10 minutes)" and concluded that the findings "show[ed] no evidence of hypersomnia." [Dkt. 10-7 at 355.] Accordingly, the ALJ reasonably concluded that the tests "overall demonstrated no evidence of hypersomnia." [Dkt. 10-2 at 17.] This conclusion is entirely consistent with the Multiple Sleep Latency Report, and because the ALJ simply reiterated what Dr. Levine determined through the study, the ALJ was not "interpreting" medical data as Morgan suggests.

The Court also rejects Morgan's claim that the ALJ erred because she "chose to go with no hypersomnia on naps 3, 4, and 5 while completely ignoring a finding of hypersomnia on nap 1 and 2." [Dkt. 15 at 6. (internal quotation marks omitted).] The ALJ did not "choose" to give findings of no hypersomnia greater weight than findings of hypersomnia or otherwise step beyond the data and provide her own evaluation of the significance of the data. Again, the Multiple Sleep Latency Report shows that Dr. Levine calculated a mean sleep latency of 11.5 minutes after compiling the results from all five naps and made an overall conclusion that the study did not show evidence of hypersomnia. Nevertheless, the ALJ acknowledged that the test "proved positive for hypersomnia on her first 2 naps" and accommodated Morgan's complaints of "excessive sleepiness" by limiting her to work "requiring no ladders, ropes, or scaffolds, or exposure to unprotected heights or operation of heavy machinery." [Dkt. 10-2 at 17.] The ALJ accepted Dr. Levine's findings and did not attempt to interpret this data or "play doctor" in any way, and it was entirely appropriate for the ALJ rely on Dr. Levine's interpretation of this data.

---

[7] "In the multiple sleep latency test (MSLT), a person is given 4-5 opportunities to sleep every two hours during normal wake times. The specialist uses the test to measure the extent of daytime sleepiness (how fast the patient falls asleep in each nap, also called sleep latency), and also how quickly REM sleep begins." https://stanfordhealthcare.org/medical-conditions/sleep/narcolepsy/diagnosis/multiple-sleep-latency-test.html.

The ALJ also appropriately relied on medical opinion evidence in formulating the RFC. Morgan argues that the ALJ should have ordered a consultative examination or requested medical expert testimony to properly interpret the sleep study test and assess plaintiff's functional limitations. But Dr. Levine interpreted his Multiple Sleep Latency Study and provided a clear conclusion, so there was no need for further medical interpretation. In terms of functional limitations, the RFC limits Morgan to "no ladders, ropes, or scaffolds, or exposure to hazards such as unprotected heights, operation of heavy machinery, or commercial driving." [Dkt. 10-2 at 16.] This is consistent with Dr. Asis's recommendation against driving and operating heavy machinery, [dkt. 10-7 at 339], and Morgan has not cited any medical opinion evidence indicating that the ALJ failed to adopt any recommended functional limitations. Thus, the Court can trace the ALJ's reasoning in formulating the RFC, and it is clear that the ALJ did not interpret any medical evidence.[8] For these reasons, the Court concludes that Morgan has not met her burden to show reversible error in the ALJ's decision on the points she raises in this section.

### C. The ALJ did not fail to adequately evaluate Morgan's subjective complaints.

Morgan claims that the ALJ improperly evaluated testimony pertaining to the intensity, persistence, and limiting effects of Morgan's symptoms for one reason: the ALJ mischaracterized the record by finding that "[n]othing in the medical evidence of record demonstrates that [Morgan] has undergone any treatment." [Dkt. 12 at 24.] Morgan points out that she takes multiple medications and that her treatment consists of regular follow-ups and compliance with her prescribed medication regimen. [*Id.*] Morgan also asserts that she was hospitalized in 2019 for

---

[8] While Morgan's main contention here is that the ALJ improperly interpreted the Multiple Sleep Latency Test, she does claim in her briefing that the ALJ also inappropriately interpreted a polysomnogram. [Dkt. 12 at 18.] Review of the decision shows that the ALJ did note this polysomnogram but did not draw any conclusions about this study and did not interpret any raw data from it. Thus, the Court notes that this argument is also not a basis for remand.

severe depression and continued to receive mental health treatment after her hospitalization. [*Id.* at 25.] Thus, Morgan claims that, by allegedly finding that she had not undergone any treatment, the ALJ did not adequately evaluate whether Morgan's subjective symptoms were consistent with the treatment she received. [*Id.*]

In response, the Commissioner contends that Morgan takes the ALJ's statement out of context. [Dkt. 14 at 18.] In fact, the Commissioner claims that the ALJ repeatedly acknowledged and discussed Morgan's treatment with medications. [*Id.*] The Commissioner also points out that, under the regulations, the ALJ is instructed to consider the claimant's medications. [*Id.*] But a separate factor under the regulations is "treatment, other than medication" that the claimant has received. [*Id.* (quoting 20 C.F.R. § 404.1529(c)(v)).] Read in context, the Commissioner argues that the ALJ's finding that Morgan had not "undergone any treatment" was merely the ALJ's consideration of the relevant regulatory factors, and the ALJ was merely distinguishing medication treatment and other types of treatment. [*Id.* at 18-19.] Thus, the Commissioner claims that it was reasonable for the ALJ make such a finding because Morgan did not engage in any treatment other than conservative medication management. [*Id.* at 19.]

Morgan asserts in her reply brief that she rests on the arguments made in her opening brief. [Dkt. 15 at 7.]

When assessing a claimant's subjective symptoms, an ALJ will complete a two-step process. First, the ALJ will "consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *3. Second, "once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established," the ALJ will "evaluate the intensity and

persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.* The ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless the objective medical evidence supports a finding that the claimant is in fact disabled. *Id.* at *4-5. The ALJ will consider factors including (but not limited to) the claimant's daily activities and the effectiveness of the claimant's medications or treatment. *Id.* at *7-8. The court must afford the ALJ's determinations special deference, and it will only reverse if the ALJ's determination is patently wrong. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).

The Court agrees with the Commissioner that the ALJ's statement on which Morgan relies for this argument is taken out of context. Read in context, it is clear that over multiple paragraphs of the decision, the ALJ did adequately consider Morgan's treatment that consisted of medication management. For example, the ALJ expressly recognized that Morgan's "medication regimen and treatment history are … inconsistent with her allegations of disability;" that Morgan "admitted she experiences symptom improvement with medication;" that Morgan "reported that taking Vyvanse helped her excessive daytime sleepiness, and it gave her a boost within a few minutes;" that a January 2022 treatment note indicated that "Vyvanse 40 mg and Ritalin 5 mg was helping her;" and that "[a]lthough [Morgan] alleged various side effects from the use of medications, office treatment notes, do not note that [Morgan] complained of experiencing any medication-related side effects." [*Id.* at 17-18.] In fact, Morgan even block quotes much of the ALJ's express consideration of her medication treatment in her own briefing, thereby acknowledging the ALJ's reasoned analysis. [*See* dkt. 12 at 24.]

In light of the ALJ's discussion of Morgan's medication treatment, the Court agrees with the Commissioner that the statement Morgan challenges was simply the ALJ noting that Morgan

did not pursue any other treatments aside from her medication regimen. *See* 20 C.F.R. § 404.1529(c)(v) (outlining the different factors that the SSA will consider, including "[t]he type, dosage, effectiveness, and side effects of any medication" and "*[t]reatment, other than medication*, you receive or have received for relief of your pain or other symptoms") (emphasis added). A commonsense reading of this portion of the ALJ's opinion does not support Morgan's argument because the opinion clearly shows that the ALJ was aware of and considered Morgan's medication treatment. *See Fanta v. Saul*, 848 F. App'x 655, 659 (7th Cir. 2021) (explaining that "[w]hen reviewing an ALJ's opinion, we give the opinion a commonsensical reading rather than nitpicking it") (internal quotation marks omitted).

Morgan also claims that the ALJ failed to consider certain treatments, including "multiple visits with the Indiana Neuroscience Center for Circadian Rhythm Disorder," her hospitalization in 2019 for severe depression, and mental health treatments with Nurse Practitioner Davis. [Dkt. 12 at 24-25.] But the ALJ did expressly consider Morgan's 2019 hospitalization, explaining that Morgan "underwent treatment due, in part, to her reported abuse of Vyvanse" and that "[f]rom May 2019 to June 2019, [Morgan] received mental health treatment for worsening depression." [Dkt. 10-2 at 14-15.] Additionally, Morgan's record citation for her "mental health treatment" with Nurse Practitioner Davis does not contain any evidence of mental health treatment beyond managing Morgan's anxiety, depressive disorder, and poor focus with Lexapro, Abilify, and Strattera. [Dkt. 10-7 at 74.] And with respect to her claim that she had multiple visits with the Indiana Neuroscience Center, Morgan cites a single medical record that merely summarizes Morgan's symptoms and provides that her treatment consisted of medication. [Dkt. 10-7 at 311.] Accordingly, the Court concludes that Morgan has not met her burden to show reversible error in the ALJ's decision on the points she raises in this section.

## IV. CONCLUSION

The standard for disability claims under the Social Security Act is stringent. *Plessinger v. Berryhill*, 900 F.3d 909, 911 (7th Cir. 2018). "The Act does not contemplate degrees of disability or allow for an award based on partial disability." *Williams-Overstreet v. Astrue*, 364 F. App'x 271, 274 (7th Cir. 2010) (citing *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985)). "Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Id.* Taken together, the Court can find no legal basis presented by Morgan to reverse the ALJ's decision that she was not disabled during the relevant period. Therefore, the decision below is **AFFIRMED.** Final judgment shall issue accordingly.

**SO ORDERED.**

Date: 9/13/2023

Kellie M. Barr
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email